UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

HAYLEY SHELTON, on behalf of \*
herself and others similarly situated, \*
\* NO. _____
Plaintiff, \*
\* JURY DEMANDED
v. \*
\*
NOVACOPY, INC. and \*
NOVATECH, INC., \*
\*
Defendants. \*

## COMPLAINT

Comes Plaintiff, Hayley Shelton, by and through counsel, and sues Defendants (hereinafter referred to as "Defendants") for damages relating to violations of the Equal Pay Act and all other applicable laws, alleging as follows:

1. Plaintiff, a female, is a resident of Nashville, Davidson County, Tennessee and has at all times relevant to this case resided in the Middle District of Tennessee.

2. Plaintiff was employed by Defendant NovaCopy, Inc. in Nashville, Davidson County, Tennessee. Defendant NovaCopy, Inc. recently changed its name to Novatech, Inc. Both are referred to as "Defendants." Defendants' operations are sufficient to classify Defendants as an "employer" within the meaning of all relevant laws.

3. This Court has jurisdiction over this case by virtue of 28 U.S.C. § 1331.

4. Venue is appropriate in this District.

5. Plaintiff became employed by Defendants in July of 2015 as the Human Resources Manager. Plaintiff was quickly promoted to the position of Human Resources Director.

Page **1** of **9**

Case 3:18-cv-00558   Document 1   Filed 06/14/18   Page 1 of 9 PageID #: 1

6. Throughout the course of her employment, Plaintiff was subjected to disparate treatment on the basis of her gender with regard to pay, working conditions, and promotional opportunities.

7. Defendants have engaged in a pattern and practice of discrimination and retaliation against women on the basis of their gender in terms of pay, working conditions, exposure to sexual harassment and promotional opportunities and complaints about the same.

8. The CEO and one owner of Defendants is Darren Metz. Plaintiff reported directly to Mr. Metz.

9. Upon becoming employed, Plaintiff was almost immediately subjected to an atmosphere that was rampant with sexual innuendo and bias.

10. For example, when she was hired, Plaintiff replaced a pregnant female, Mandy Quarles. Plaintiff was told by management, in reference to her predecessor, "when women have kids, it ruins their commitment level." Mr. Metz said that Ms. Quarles starting "phoning it in" when she became pregnant and Plaintiff was told that Ms. Quarles "lost her edge."

11. Mr. Metz also told Plaintiff that Ms. Quarles had been too "mousy" and he wanted Ms. Shelton to "shake things up." Mr. Metz also told Ms. Shelton that he wanted her to take on an expanded role, helping to lead the executive management team and work on revitalizing company culture. Mr. Metz began referring to Plaintiff as the HR Director long before she received the official title.

12. In the meeting before Plaintiff was given the official title change to "Director," Mr. Metz very seriously asked Plaintiff whether she was planning to have any more children. Although she knew the inquiry was highly inappropriate and though she and her husband had planned on adopting one day, she told Mr. Metz that her family was complete at that time.

13. In fact, Darren Metz told Plaintiff in front of other employees that she was not permitted to get pregnant while working for Defendants and that it would be bad for her career. As a result, she and her husband delayed plans to adopt. Later on in her employment in March of 2016, Mr. Metz came out and asked Plaintiff if she was pregnant when she indicated she was tired in the middle of the day.

14. In the early days, Mr. Metz otherwise treated Plaintiff in a positive manner and showered her with public attention. Indeed, it became a topic of conversation among employees, with employee Cameron Rochelle referring to Ms. Shelton as "Darren's new pet." Mr. Metz suggestively invited Plaintiff to come and "swim" at his house and encouraged Plaintiff to wear "peekaboo" tops to work.

15. Plaintiff was also repeatedly harassed by the Account Executive, Bryan Winfree. Mr. Winfree made numerous false and defamatory sexual comments about Plaintiff's past and her character. Mr. Winfree told other employees that Plaintiff was a "whore" and that she cheated on men.

16. Plaintiff reported Mr. Winfree's remarks to Mr. Metz, who laughed and instructed Plaintiff to just ignore it, saying that he had recently attended a Titans game with Mr. Winfree. According to Mr. Metz, during the game, Mr. Winfree told Mrs. Metz not to trust her husband to be alone with Ms. Shelton. Shortly after that, Mr. Metz made comments that his next HR Director would be someone in their "50s and "on their last job" so that Mrs. Metz would be happy at home.

17. Following that, during a work trip to the East Tennessee offices, Mr. Metz jokingly told Plaintiff that she should not go on the upcoming company trip because his wife hated her. In this conversation, Mr. Metz said he "was a good boy for his wife," but said he had not always been

and his wife kept a close eye on him as a result. On the same trip, Mr. Metz told Ms. Shelton that if she could not get along with Mr. Winfree, she would not get to go to the trip to Mexico. Mr. Metz later had Mr. Winfree apologize during the company Christmas party, but it was not genuine and Mr. Winfree continued to make defamatory sexual comments about Plaintiff afterwards.

18. At one point, the company took employees on a trip to Cabo San Lucas and Plaintiff was invited. The trip was rife with sexual innuendo. There were rumors of a number of sexual escapades involving employees. At one point on the trip, Mrs. Metz, who was intoxicated, told Plaintiff that her husband wanted to go to their room and have sex but she was not interested. During that trip, Mrs. Metz grabbed Plaintiff's breasts to "see if they were real." Mrs. Metz also insinuated that Plaintiff was having sexual relations with her husband, all in front of Plaintiff's husband and a number of other employees and referring to Plaintiff as "that bitch."

19. Following the Cabo trip, Mr. Metz complained that he did not get to see as much of Plaintiff during the trip as he would have liked. Mr. Metz encouraged Plaintiff to "bring a hot friend" next year to Cabo, instead of her husband who took up too much of her time.

20. During Plaintiff's employment, she was asked by upper management about whether she was in an open marriage and whether she was willing to engage in sexual relationships. Specifically, Marty Wood, the head of sales in the Memphis office, told Plaintiff that Mr. Metz liked employees with open marriages. In that conversation, Mr. Wood hinted that many employees engaged in sexual activities with the Metz during the Mexico trip. Further, Mr. Wood told Plaintiff that another manager, Chris Cook, followed him and his wife to their hotel room during this trip in the hopes of engaging in sexual activity and they had to "chase him off." Chris Cook, like many of the male employees of Defendants, has engaged in the sexual

harassment of female employees on several occasions that have been reported to Defendants. Nonetheless, Defendants have not prevented his behavior.

21. During her job, Plaintiff became aware of sexual harassment issues and accusations made against and involving the Chattanooga Branch Manager, Benny Malicoat. Indeed, Mr. Malicoat appeared to be a serial harasser and routinely engaged in relationships with his subordinates. Mr. Malicoat was one of Mr. Metz' favored employees.

22. Mr. Metz made it clear to Plaintiff that no serious action would be taken against Mr. Malicoat and specifically instructed her not to investigation certain allegations involving him and not to provide certain information to the company's attorney.

23. Defendants work atmosphere was flush with negative comments about women. Female employees were encouraged to date men in the office since being in a relationship "makes them prettier" and makes them "take care of themselves better," according to male managers. These comments were openly made during large meetings, both by Mr. Metz and employee Joe White.

24. When Defendants' training manager, Kaylie Blaise, was pregnant and went on leave, management said, "there isn't enough blood to feed both baby and brain." Mr. Metz said that she was not cute anymore due to her pregnancy. Although she had been a staff favorite before her pregnancy, afterwards Mr. Metz said her job was suffering and he wanted to fire her and replace her with Matthew Rogers.

25. Plaintiff discussed and complained about many of these issues with the Executive Coach, Dan Haile.

26. In addition to the rampant gender issues, Plaintiff observed Mr. Metz engage in a pattern of retaliation against employees who stood up to Defendants or the gender discrimination issues.

27. Despite being employed in a director-level position, Plaintiff's pay was less than that of male employees with similar levels of reporting responsibility, even though Plaintiff had superior qualifications and experience.

28. One of Plaintiff's undertakings for Defendants involved completing a wage study to reveal whether the salaries paid to employees were on par with the industry. Plaintiff's study revealed that nearly all of the employees whose salaries were not on par were females and Plaintiff was one of them. The study showed that female employees made approximately .77 cents for every 1.00 earned by similarly-situated male employees. Around that time, a female manager had complained about her pay in comparison with a newly-hired male employee who has less experience and a higher wage.

29. When Plaintiff revealed that to Mr. Metz, he was visibly very mad and he instructed Plaintiff to find some male employees to include in the results so it did not appear as though Defendants were discriminating against women. Plaintiff declined and said that while she would ensure there were no inaccuracies, she refused to manipulate the results to make them artificially appear more gender-equal.

30. During the last week of her job, Plaintiff discussed with Mr. Metz the wage study results and how her salary was not commensurate. Indeed, on the Thursday before her termination, Plaintiff was asked to sign an "Executive Pledge" as part of a new executive contract that was being negotiated. Plaintiff's salary, as compared to the salary of male employees, was one topic being discussed. Plaintiff told Mr. Metz that she had two masters degrees and that there were no

male executives with advanced degrees and, yet, without justification, women were making 65-75% of what males were making. In response, Mr. Metz said, "are you on our team or not?"

31. Plaintiff was fired the following Monday without explanation and with no prior discipline.

32. Plaintiff suffered significant damages as a result.

33. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission bearing charge number 494-2017-00133.

## COUNT I

34. Defendants violated the Equal Pay Act, 29 U.S.C. § 206(d), by paying Plaintiff, and all others similarly situated, less than male employees performing similar work under similar working conditions and by retaliating against Plaintiff due to her protected activities under the Equal Pay Act.

35. Defendants' violations were willful.

## COUNT II

36. In creating a hostile and offensive work environment on the basis of gender, in engaging in gender discrimination in the terms and conditions of employment (including pay, work conditions, unlawful employment qualifications, promotions, discipline, and termination), and in retaliating against women who complain about the same, Defendants have violated a host of other laws prohibiting gender discrimination in employment and protecting those who complain about or participate in protected activity about the same. Plaintiff plans to formally assert these legal claims once they are ripe.

37. As a result of all of the Defendant's wrongful conduct, the Plaintiff has suffered lost pay, benefits, career damage, and the humiliation and embarrassment flowing from the discriminatory and retaliatory treatment described herein.

38. Plaintiff accordingly prays for the following relief:

a. That the Court issue and serve process on Defendants and require Defendants to answer within the time prescribed by law;

b. That upon the hearing of this cause Plaintiff be awarded judgment for damages for lost wages and the value of all employment benefits, which she has lost from the date of Defendants' discriminatory action;

c. That the Court issue an injunction requiring Defendants to re-employ Plaintiff at an equivalent job with all employment rights and benefits to which she would have been entitled but for her discharge, and without harassment or illegal conditions imposed on her job, or, in the alternative, front pay and benefits in lieu of reinstatement.

d. That Plaintiff be awarded additional compensatory damages, including damages for humiliation and embarrassment, and emotional distress, as are allowed under relevant laws prohibiting discrimination and retaliation;

e. That Plaintiff be awarded attorney fees and such other and further relief as the Court deems proper under relevant laws prohibiting discrimination and retaliation;

f. That Plaintiff be awarded all compensatory and punitive damages as the Court deems proper under relevant laws prohibiting discrimination and retaliation;

g. That Plaintiff be awarded all back pay, damages, and liquidated damages to which she is entitled for Defendants' violations of the Equal Pay act; and

h. Plaintiff demands a jury to try all claims and issues triable by a jury.

Respectfully submitted,

BURNETTE, DOBSON & PINCHAK

By: s/ *H. Eric Burnette*
Donna J. Mikel, Esq. (*pro hac vice* pending)
H. Eric Burnette, Esq. (BPR# 024342)
711 Cherry Street
Chattanooga, TN 37402
Phone: (423) 266-2121
Fax: (423) 266-3324
Email: dmikel@bdplawfirm.com
Email: eburnette@bdplawfirm.com